

United States Department of the Interior

FISH AND WILDLIFE SERVICE
1011 E. Tudor Road
Anchorage, Alaska 99503-6199

IN REPLY REFER TO:

JUL 23 2013

FWS/RD

Commissioner Daniel S. Sullivan
Department of Natural Resources
Office of the Commissioner
550 W. 7th. Avenue, Suite 1400
Anchorage, AK 99501

Dear Commissioner Sullivan:

This letter responds to the State of Alaska's "ANILCA Section 1002(d) Exploration Plan and Special Use Permit Application and Supporting Materials" (Exploration Plan) delivered to the U.S. Fish and Wildlife Service (Service) Regional Office on July 9, 2013. The stated goal of the Exploration Plan is "to evaluate the petroleum resource potential" of the 1002 Area of the Arctic National Wildlife Refuge. Exploration Plan at 13. The provided documentation is also intended to serve as an application for a special use permit under section 1002 of the Alaska National Interest Lands Conservation Act (ANILCA), 16 U.S.C. § 3142. Exploration Plan at 13.

The statutory and regulatory authority for submitting an Exploration Plan and related special use permit expired long ago. The authorization for an exploration program in section 1002 of ANILCA expired in 1987 when the Secretary of the Interior submitted the Report required by that section to Congress. Enclosed is a January 18, 2001 legal memorandum to the Secretary of the Interior from the Solicitor of the Department of the Interior which concluded that, with the submittal of the report required by section 1002(h) in 1987, "the authorization for exploratory activity expired, and the statute does not provide any continuing authority for additional exploratory activities in the coastal plain of the Arctic Refuge at the present time."

This statutory bar to further exploration is confirmed, and reinforced, by a regulatory bar. As you are aware, after public notice and comment, the Service published final regulations in 1983 addressing the requirements of section 1002 found at 50 C.F.R. Part 37 which the Service is required to follow. 48 F.R. 16,838 (April 19, 1983). Applying those regulations, the Service has determined that the Exploration Plan does not meet the requirements of 50 CFR § 37.21(b) (2011) and therefore cannot be considered by the Service. Specifically, section 37.21(b) limits the submittal of exploration plans to the Service to two specific dates: May 20, 1983 and

TAKE PRIDE
IN AMERICA

April 2, 1984. In the preamble to the final rule, the Service explained its decision to limit the submission to only these two dates:

> Two commenters sought clarification as to whether section 37.21(b) means that applications (i.e., exploration plans) can only be filed on the dates specified. Yes, this is the intent of section 37.21(b). Its purposes are to ensure that the public review period runs concurrently on all exploration plans covering the period and submitted on the dates specified in section 37.21(b), and to facilitate comparison of plans in the application of these guidelines.

48 F.R. at 16,844. Thus, the State of Alaska's Exploration Plan has been submitted years too late and has not been submitted in accordance with 50 C.F.R. § 37.21(b). As a result, the State's Exploration Plan will not be analyzed for conformance with the criteria for exploration plans set forth in 50 CFR part 37, subpart C, nor will it be published, or a hearing held, under the provisions of 50 C.F.R. § 37.22(b).

If the State of Alaska is dissatisfied with this disapproval of the Exploration Plan as untimely under the applicable regulations, any request to reconsider my decision must be filed in writing with the Director of the Service within thirty days of the date of this letter in accordance with 50 CFR § 37.22(c) (2011).

Sincerely,

*[signature]*

Geoffrey Haskett
Regional Director

Enclosure: January 18, 2001 Memorandum to the Secretary



THE SECRETARY OF THE INTERIOR
WASHINGTON

JAN 18 2001

Honorable Edward J. Markey
House of Representatives
Washington, DC 20515-2107

Dear Mr. Markey:

This is in response to your letter of December 14, 2000, asking about what current law allows or prohibits in the Arctic National Wildlife Refuge in Alaska (Arctic Refuge). I referred your letter to the Solicitor's Office, and I am enclosing the Solicitor's Opinion on the subject. I concur in that Opinion.

The Opinion begins by noting:

> ANILCA § 1003 contains a broad prohibition on "production of oil and gas from the Arctic National Wildlife Refuge," and also explicitly states that "no leasing or other development leading to production of oil and gas from the range, shall be undertaken until authorized by an Act of Congress." 16 U.S.C. § 3143. Section 1002 of ANILCA also expressly withdrew "all public lands within the coastal plain" of the Arctic Refuge from all forms of entry or appropriation under the mining laws, and from operation of the mineral leasing laws of the United States. 16 U.S.C. § 3142(i).
>
> These statutory prohibitions plainly bar oil and gas leasing anywhere in the Arctic Refuge until Congress enacts future legislation. The additional statutory bar to "other development leading to production of oil and gas" from the Arctic Refuge generally prohibits pre-leasing oil and gas exploratory activities on the Refuge that could lead to production of oil and gas, except [for limited exploratory activities authorized by section 1002].... It is worth emphasizing that the withdrawals and the prohibitions in §§ 1002(i) and 1003 on activities leading to production of oil and gas from the Arctic Refuge were unique to this specific refuge and are not applicable to any other national wildlife refuge in Alaska. See ANILCA Title III (National Wildlife Refuge System in Alaska), and § 1009, 16 U.S.C. §§ 668dd, 1601, 3149.

The Opinion concludes, after extensive analysis, that the Department has no legal authority under current law to restart the exploration program in the Arctic Refuge. It explains that the authorization of an exploration program in Section 1002 of the Alaska National Interest Lands Conservation Act (ANILCA), 16 U.S.C. §§ 3142, expired when the Secretary of the Interior submitted the Report to Congress in 1987, as directed by the Congress in that section. Its conclusion is:

In sum, the statute's purposes, its text, the structure and design of the study program it established, the deadlines it set for the Secretarial report and its call for that report to contain a recommendation to Congress "with respect to whether further exploration . . . should be permitted," its pertinent legislative history, and the Interior Department's contemporaneous interpretation as set out in its final rule, all lead to the conclusion that the better reading of § 1002 of ANILCA is that it was a time-limited authorization for exploratory activities in the coastal plain. Once the five year study was complete and the section 1002(h) report submitted to Congress, the authorization for exploratory activity expired, and the statute does not provide any continuing authority for additional exploratory activities in the coastal plain of the Arctic Refuge at the present time.

The Opinion also concludes that the mineral assessment authority of § 1010 of ANILCA does not provide separate authority for any exploration of the Refuge, because its general mineral assessment provisions are superseded by the much more specific, and restrictive, exploration program authorized in § 1002.

I trust this fully responds to your questions.

Sincerely,

Bru Babbitt

Enclosure



United States Department of the Interior

OFFICE OF THE SOLICITOR
Washington, D.C. 20240

January 18, 2001

Memorandum

To: Secretary

From: Solicitor

Re: Arctic National Wildlife Refuge: Response to Congressman Markey's Questions

This is in response to your request that I address the legal issues raised in Congressman Markey's December 14, 2000 letter to you, where he asks about what kinds of oil and gas related activities current law allows or prohibits in the coastal plain of the Arctic National Wildlife Refuge (hereafter, the Arctic Refuge).

## Introduction

In Title X of the Alaska National Interest Lands Conservation Act (ANILCA), Pub. L. 96-487, 94 Stat. 2452 (Dec. 2, 1980), as amended and codified at 16 U.S.C. §§ 3141-3151, Congress gave detailed direction for the management and study of the Arctic Refuge, and particularly the 1.5 million acre northernmost portion of the refuge which Congress denominated the "coastal plain." The boundaries of the coastal plain were established in § 1002 of ANILCA by reference to a map entitled "Arctic National Wildlife Refuge," dated August 1980. See 16 U.S.C. § 3142(b)(1). Because of this statutory designation, the Arctic Refuge's coastal plain is also commonly referred to as the "1002 area," and these terms are used interchangeably herein.

The Arctic National Wildlife Refuge consists of about 19.5 million acres, of which approximately 8 million acres is within a congressionally designated Wilderness Area. See ANILCA §§ 303(2), 702(3), 16 U.S.C. §§ 668dd, 1132 note. None of the coastal plain is within the congressionally designated Wilderness Area, but almost all of it is natural and pristine in character.

## Summary of Statutory Provisions

As the Congressman's letter notes, ANILCA § 1003 contains a broad prohibition on "production of oil and gas from the Arctic National Wildlife Refuge," and also explicitly states that "no leasing or other development leading to production of oil and gas from the range, shall be

undertaken until authorized by an Act of Congress." 16 U.S.C. § 3143.[1] Section 1002 of ANILCA also expressly withdrew "all public lands within the coastal plain" of the Arctic Refuge from all forms of entry or appropriation under the mining laws, and from operation of the mineral leasing laws of the United States. 16 U.S.C. § 3142(i).

These statutory prohibitions plainly bar oil and gas leasing anywhere in the Arctic Refuge until Congress enacts future legislation. The additional statutory bar to "other development leading to production of oil and gas" from the Arctic Refuge generally prohibits pre-leasing oil and gas exploratory activities on the Refuge that could lead to production of oil and gas, except as discussed further below. It is worth emphasizing that the withdrawals and the prohibitions in §§ 1002(i) and 1003 on activities leading to production of oil and gas from the Arctic Refuge were unique to this specific refuge and are not applicable to any other national wildlife refuge in Alaska. See ANILCA Title III (National Wildlife Refuge System in Alaska), and § 1009, 16 U.S.C. §§ 668dd, 1601, 3149.

These two sections, 1002 and 1003, must be read together. In § 1002, Congress specifically directed the Secretary of the Interior to carry out a study of the fish and wildlife resources of the coastal plain of the Arctic Refuge. 16 U.S.C. § 3142(c). The study was to lead to a report to the Congress between December 2, 1985 and September 2, 1986. 16 U.S.C. § 3142(h). The report was to include, among other things, the Secretary of the Interior's recommendations "with respect to whether further exploration for, and the development and production of oil and gas within the coastal plain should be permitted" by Act of Congress. Id.

The purposes of section 1002 were set forth in its opening subsection:

> The purpose of this section is to provide for a comprehensive and continuing assessment of the fish and wildlife resources of the coastal plain of the Arctic National Wildlife Refuge; an analysis of the impacts of oil and gas exploration, development, and production, <u>and to authorize exploratory activity within the coastal plain in a manner that avoids significant adverse effects on the fish and wildlife and other resources.</u>

16 U.S.C. § 3142(a) (emphasis added). Although this subsection is captioned "purpose" in the singular, it plainly sets out three purposes: to "provide for a comprehensive and continuing inventory and assessment of" the coastal plain's fish and wildlife resources; to "provide for . . . an analysis of the impacts of oil and gas exploration, development, and production;" and "to authorize exploratory activity within the coastal plain in a manner that avoids significant adverse effects . . .."

Subsection (b) defined "exploratory activity" as meaning "surface geological exploration or

---

[1] The entire Arctic National Wildlife "Range," which pre-dated ANILCA by 20 years, was included within the Arctic National Wildlife Refuge established by ANILCA in 1980. See ANILCA § 303(2), 16 U.S.C. § 668dd note. Therefore, what used to be the "Range" is referred to as the Arctic Refuge throughout this memorandum.

seismic exploration, or both, for oil and gas within the coastal plain." This definition excluded from the resource assessment program the drilling of any exploratory oil and gas wells in the coastal plain. Instead, activities were limited to surface geological and seismic operations. 16 U.S.C. § 3142(b)(2); See also 50 C.F.R. §37.11(d).

Section 1002 goes on to create a very detailed, carefully structured three-stage sequential process for obtaining this information and then preparing the Secretary's report and recommendations to Congress:

First, a baseline study of fish and wildlife and their habitat on the coastal plain was required to be prepared, including an assessment of the impacts of human activities on those resources, and the potential impacts of oil and gas exploration, development and production. 16 U.S.C. § 3142(c). The initial baseline study was to be published by June 2, 1982, and was to be revised and updated as new information became available. Id.

Second, the Secretary was directed to establish, by regulation by December 2, 1982, initial guidelines for carrying out the authorized program of exploratory activities. 16 U.S.C. § 3142(d). These guidelines could be revised subsequently "to reflect changes made in the baseline study and other appropriate information made available to the Secretary." 16 U.S.C. § 3142(d)(2). The guidelines were to include "such prohibitions, restrictions, and conditions on the carrying out of exploratory activities as the Secretary deems necessary or appropriate to ensure that exploratory activities do not significantly adversely affect the fish and wildlife, their habitats, or the environment," including "requirements that exploratory activities be coordinated in such a manner as to avoid unnecessary duplication." 16 U.S.C. § 3142(d)(1). Congress also specified that an environmental impact statement was to be prepared to assess the environmental effects of the exploratory activities to be authorized under the guidelines. 16 U.S.C. § 3142(d)(2). No exploration plans were to be approved for two years following December 2, 1980, while the baseline study was proceeding and the regulatory guidelines were being prepared. 16 U.S.C. § 3142(e)(2).

Third, after regulatory guidelines were adopted, the Secretary was authorized to initiate a program of oil and gas exploration. Persons (including the U.S. Geological Survey) could submit plans for "exploratory activity," as defined in § 1002(b)(1). 16 U.S.C. § 3142(b)(2). The section laid out detailed procedures for review and approval of these plans, which included being subject to public review and comment, see 16 U.S.C. § 3142(e)(1), (2), and which could be approved by the Secretary if they were consistent with the regulatory guidelines. 16 U.S.C. § 3142(e). Section 1002(e) also required that all data and information acquired as a result of approved exploratory activities (including processed, analyzed and interpreted information) had to be submitted to the Secretary, 16 U.S.C. § 3142(e)(2)(B), and made available to the public, except that processed, analyzed and interpreted data would be held confidential by the Secretary until two years following any lease sale including the area from which the information was

obtained. Id. 16 U.S.C. § 3142(e)(2)(C).[2] The legislative history underscored Congress' intent that all the relevant energy and environmental information was to be made available to it before Congress made any decision on whether to open up the coastal plain to further oil and gas exploration, development and production. See Sen. Rep. No. 96-413, 96th Cong. 1st Sess. at 294 (November 14, 1979), *reprinted in* 1980 U.S. Code Cong. & Adm. News at 5238.

The fourth and last part of § 1002 directed the Secretary, after the five year assessment provided for in the Act was complete, and within five years and nine months after enactment, to prepare and submit to Congress a report containing:

> (1) the identification by means other than drilling of exploratory wells of those areas within the coastal plain that have oil and gas production potential and estimate of the volume of the oil and gas concerned;
> (2) the description of the fish and wildlife, their habitats, and other resources that are within the areas identified under paragraph (1);
> (3) an evaluation of the adverse effects that the carrying out of further exploration for, and the development and production of, oil and gas within such areas will have on the resources referred to in paragraph (2);
> (4) a description of how such oil and gas, if produced within such area, may be transported to processing facilities;
> (5) an evaluation of how such oil and gas relates to the national need for additional domestic sources of oil and gas; and
> (6) the recommendations of the Secretary with respect to whether further exploration for, and the development and production of, oil and gas within the coastal plain should be permitted and, if so, what additional legal authority is necessary to ensure that the adverse effects of such activities on fish and wildlife, their habitats, and other resources are avoided or minimized.

ANILCA § 1002(h); 16 U.S.C. § 3142(h).

## The Statute Implemented

---

[2] This last requirement was amended by Congress in 1982 to prohibit any person obtaining geological and geophysical information produced as a result of the exploratory program (whether the information was received from the Department or from anyone other than a permittee conducting the exploratory activities) from participating in any subsequent lease sale which includes the area from which the information was obtained or from making any other commercial use of such data. The amendment also required any permittee which conducted exploratory activities on the coastal plain to make available the data from its exploration to any person at fair cost. See Title I of the 1983 Department of the Interior and Related Agencies Appropriations Act, Pub. L. 97-394, § 110, 96 Stat. 1982 (December 30, 1982). The 1982 amendment put all commercial interests on an equal footing by denying any company that obtained data from a source other than a permittee from participating in subsequent lease sales in the area, while requiring any permittee to sell the data it had acquired at a fair cost. The legislative history of this amendment indicates that the purpose was provide the oil and gas industry with an economic incentive to participate in the exploration program, notwithstanding the requirement that the data would be made public. See H.R. Rept. No. 978, 97th Cong., 2d Sess. 27 (Dec. 17, 1982).

Except for a couple of missed deadlines, this process was implemented by the Department as it was laid out in § 1002. The publication of the initial § 1002 guidelines for the geological and geophysical exploration of the coastal plain of the Arctic Refuge was delayed for four months beyond the December 2, 1982 deadline, as a result of a court order invalidating the Secretary's initial decision to transfer responsibility for developing the guidelines from the U.S. Fish and Wildlife Service to the U.S. Geological Survey. See Trustees for Alaska v. Watt, 524 F. Supp. 1303 (D. Alaska 1981), *aff'd per curiam*, 690 F.2d 1279 (9th Cir. 1982). The guidelines were published on April 19, 1983. See 48 Fed. Reg. 16838, *codified as* 50 C.F.R. Part 37. The guidelines were subsequently revised once to change slightly the deadlines for submission of exploration plans to the Department for consideration. See 49 Fed. Reg. 7569 (March 1, 1984) (changing deadline from March 1, 1984 to June 4, 1984 and adding a new deadline of April 2, 1984).

In accordance with the regulatory guidelines, the U.S. Fish and Wildlife Service approved plans submitted for summer access by helicopter during 1983-85 by exploration crews from 15 companies. See U.S. Dept. of Interior, Arctic National Wildlife Refuge, Alaska, Coastal Plain Resource Assessment: Report and Recommendation to the Congress of the United States and Final Legislative Environmental Impact Statement, Vol. 1 at 3 (April 1987) (hereafter "section 1002(h) report"). The summer exploratory activities were limited to field observations, surface measurements, mapping and collection of rock samples. Id. One permit was also issued for a helicopter-supported gravity survey which was conducted during the summer of 1983. Id. Winter exploration plans involving mechanized surface transportation to conduct seismic surveys were approved for the winters of 1983-84 and 1984-85. Id. Only one permittee, representing an industry group of 23-25 companies, was permitted to collect the seismic data. More than 1,300 line miles of seismic data were acquired as a result of the winter exploratory activities between 1983 and 1985. Id. Exploratory activities in the Arctic Refuge coastal plain ceased in 1985.

Publication of the Secretary's final section 1002(h) report missed the statutory deadline by approximately seven months, because of a court ruling requiring the Secretary to seek public participation in the preparation of the legislative environmental impact statement accompanying the section 1002(h) report before submitting it to Congress. See Trustees for Alaska v. Hodel, 806 F.2d 1378 (9th Cir. 1986). The Secretary's report and recommendations were submitted to Congress in April 1987. See section 1002(h) report, supra.

## Discussion

The basic question is whether § 1002 provides authority for the Secretary to reinitiate a program of surface and seismic exploration activities on the coastal plain of the Arctic Refuge today. There are two possible answers. The first, and what we have determined is the far better, reading of the statute is that Congress required completion and submission of the section 1002(h) report by a statutory deadline which expired more than a decade ago. With the submission of that report, the statutory authority to permit exploratory activity on the Arctic Refuge coastal plain has expired.

The description of the tightly controlled, sequential steps of the study process enacted by

Congress seems to clearly indicate that the statutory authority for exploration was to end with the § 1002 study. Of particular note is the fact that the Secretary's report was to include his views "with respect to <u>whether further exploration</u> for, and the development and production of, oil and gas within the coastal plain <u>should be permitted</u> . . . ." 16 U.S.C. § 3142(h)(6) (emphasis added). This language seems to clearly indicate that Congress intended to reserve for itself the decision whether "further exploration" of the coastal plain was warranted, once the results of the § 1002 study were reported to it. Congress made no provision for any further reports by the Secretary. In short, the purposes, the structure and the overall design of § 1002 all support the idea that the exploration activities authorized in § 1002 were for the specific purpose of gathering information for the section 1002(h) report to Congress, and that the Secretary's authority to carry out further exploration after that is not permitted without the further consent of Congress.

The legislative history strongly supports this interpretation. The most authoritative guidance in the history is found in the Report of the Senate Energy and Natural Resources Committee on the versions of §§ 1002 and 1003 that are almost identical to the language finally enacted in ANILCA.[3] The Report explained the study process this way:

> Section 1002, the portion of the study relating to oil and gas exploration in the Arctic Wildlife Range was substantially modified by the Committee.
>
> In that section the Secretary is directed to publish a baseline study of the fish and wildlife of the coastal plain within eighteen months after the date of enactment, <u>and to continue to gather information during the 5-year resource assessment period provided for in the section</u>.
>
> Within 2 years of enactment, the Secretary is to publish guidelines for oil and gas exploration activities which include restrictions necessary to protect fish and wildlife, and their habitats, and the environment.
>
> Thereafter, any person may submit an exploration plan to the Secretary for approval. Exploration plans submitted by the U.S.G.S. may only be approved if no other person has submitted a plan.
>
> Exploration activities are limited to seismic and geophysical work. Seismic surveys shall be conducted only through the use of vibration source equipment rather than dynamite or other explosives to provide seismic readouts. All data and information obtained from exploration shall be submitted to the Secretary.

---

[3] When the Senate Energy Committee version of the bill came up for consideration on the floor of the Senate, numerous amendments were offered. However, only two very modest changes affected §§ 1002 and 1003 of ANILCA. Amendment No. 1961, which was adopted by the full Senate on August 18, 1980, added the prohibition in §1002(e)(1) against approval of any exploration plans for two years following December 2, 1980, and the requirement in § 1002(h) that the Secretary's report to Congress must be submitted no later than five years <u>and nine months</u> from enactment (the requirement that the report be submitted in five years was already contained in the Senate Energy Committee version). <u>See</u> 126 Cong. Rec. S11119 (daily ed. August 18, 1980). On the floor of the Senate, Senator Jackson described the § 1002 exploration program as "modified slightly" by the amendment. <u>Id.</u> The whole Senate then passed the version of §§ 1002 and 1003 which became the final language in ANILCA on August 19, 1980. 126 Cong. Rec. S11193 (daily ed. August 19, 1980). The House concurred in the Senate's version on November 12, 1980. 126 Cong. Rec. H10552 (daily ed. November 12, 1980).

> Certain types of information will remain confidential.
> The Committee amendment contains a civil penalties provision for persons who are found to have violated plans or permits issued under this section.
> <u>The Secretary is required to report to Congress within 5 years after enactment on the results of the exploration, and its impact on fish and wildlife. The report is to contain his recommendation regarding further exploration and development of oil and gas within the coastal plain.</u>

Sen. Rep. No. 96-413, supra, at 240, 1980 U.S. Code Cong. & Adm. News at 5184.

The Senate Report's section-by-section analysis also strongly suggests that the exploration program was to be a limited, five-year effort: "The second phase [after the baseline study] is <u>an oil and gas exploration program, culminating in a report to the Congress, 5 years after enactment, on the resources and recommended uses of the coastal plain.</u>" Id. at 293, 1980 U.S. Code Cong. & Adm. News 5237 (emphasis added). We have found no legislative history which supports a contrary view that the exploratory activities were authorized to continue even after the section 1002(h) report was submitted to Congress.

The Department of the Interior's implementation of § 1002 also comports with this interpretation as a matter of contemporaneous administration. The initial regulatory guidelines adopted by the Department explicitly limited the exploration authorized on the coastal plain to the time frame Congress provided for the preparation of the section 1002(h) report. Department of the Interior, Final Rule: Geological and Geophysical Exploration of the Coastal Plain, Arctic National Wildlife Refuge, Alaska, 48 Fed. Reg. 16838 (April 19, 1983) (hereafter, "final rule"). The final rule set firm application deadlines for persons who wished to apply for the special use permits required to conduct exploratory activities in the coastal plain: "To be considered, exploration plans covering the period from the inception of the program through May 31, 1986 or any portions thereof must be received by the Regional Director during normal business hours on May 20, 1983 and exploration plans covering the period from October 1, 1984 through May 31, 1986 or any portions thereof must be received by the Regional Director during normal business hours on March 1, 1984." Id., 48 Fed. Reg. 16852, *codified in* 50 C.F.R. § 37.21(b)(1983).

In its "purposes" section, the final rule used language very similar to that of the Senate Committee Report quoted above:

> <u>Section 1002 mandates an oil and gas exploration program for the refuge's coastal plain. The program shall culminate in a report to Congress</u> which contains, among other things, the identification of those areas within the coastal plain that have oil and gas production potential, an estimate of the volume of oil and gas concerned, the description of the wildlife, its habitat, and other resources that are within the areas identified, and an evaluation of the adverse effects that the carrying out of further exploration for, and the development and production of, oil and gas within such areas will have on the refuge's resources.

50 C.F.R. § 37.1 (Purpose section) (emphasis added). The preamble to this final rule described

Case 3:14-cv-00048-SLG   Document 54   Filed 03/14/14   Page 11 of 16
EXHIBIT 54, p. 11

the purpose of the program this way: "The purpose of such exploration is to obtain data and information about the oil and gas production potential of the coastal plain, which will be used in preparing a report to Congress." Final Rule, supra, 48 Fed. Reg. 16838.

About ten months after the final rule was published, two small changes were made in the regulatory deadlines for submission of exploration plans. The second and last deadline for submission of exploration plans involving seismic operations was relaxed slightly, from March 1 to June 4, 1984. See 49 Fed. Reg. 7569 (March 1, 1984). In addition, a new deadline of April 2, 1984 was added for submission of any plans to conduct surface geological or geophysical exploration other than seismic exploration during the period from June 1, 1984 through May 31, 1986. Id. The explanation in the Federal Register indicated that analysis of the preliminary data collected during the winter of 1983-84 was not complete, and that "this analysis and assessment will be beneficial in processing any additional exploration plans that are submitted on a second filing date." Id. Significantly, both the final rule and the revisions of the deadlines provided that the exploration activities themselves could continue only through May 31, 1986. Id.; see also 50 C.F.R. § 37.21(b). This closing date on the activities was necessary so that the information obtained as a result of the exploration program could be included in the section 1002(h) report to Congress.

Interestingly, the Department's final rule exempted its own U.S. Geological Survey (which was specifically authorized to submit plans for exploratory activity) from the deadlines for submission of applications for special use permits. 50 C.F.R. § 37.45. The final rule also provided, however, that "[n]o plan submitted by the [U.S. Geological] Survey will be approved unless (1) no other person has submitted a plan for the area involved which satisfies the regulations of this part; and (2) the information which would be <u>obtained from the Survey is needed to make an adequate report to Congress pursuant to the Act</u>." Id. (emphasis added). No exploration plans by the U.S. Geological Survey were ever approved under § 1002. Thus, even though the regulatory deadlines for applications did not apply to the Survey, the opportunity for the Survey to apply expired when the section 1002(h) report was completed and submitted to Congress.

As noted above, Congress made no provision in § 1002 for any further reports by the Secretary after the one submitted in 1987. In 1991, the Bureau of Land Management issued an "Overview Report" that purported to update the petroleum resource estimates contained in the 1987 Report. This 1991 document was based on internal agency reanalysis of the original seismic data obtained during the 1983-86 exploration program.[4] No additional exploration of the coastal plain

---

[4] The 1991 Overview Report immediately became the subject of litigation brought by environmental groups and a federal district court ruled that the Department had to prepare a supplemental environmental impact statement under the National Environmental Policy Act, 42 U.S.C. §§ 4321 et seq., on the new information it contained. Natural Resources Defense Council v. Lujan, 768 F.Supp. 870, 891-92 (D.D.C. 1991). This decision was subsequently vacated and the case was ultimately dismissed. See Gwich'in Steering Committee v. Lujan, No. 89-2393, which was consolidated with Natural Resources Defense Council v. Lujan, Civ. No. 89-2345 (D. D.C.), vacated on appeal, Appellate No. 91-5301 (D.C. Cir. Order dated December 17, 1992), and finally dismissed by the district court (D. D.C., Order dated January 21, 1993).

was authorized, nor has any occurred since 1985, well before when the final section 1002(h) report was published.

The primary argument against expiration of the statutory authority for "exploratory activity" as defined in § 1002 rests mainly on the fact that nowhere in the section is there any express statement of expiration. Most specifically, in § 1002(a)'s statement of purpose, no end point for the exploratory activity being authorized is expressly set. Section 1002(a) describes its purpose as, among other things, "to authorize exploratory activity within the coastal plain in a manner that avoids significant adverse effects on the fish and wildlife and other resources." 16 U.S.C. § 3142(a). Yet the same "purpose" section begins by describing a purpose "to provide for a comprehensive and <u>continuing</u> inventory and assessment of the fish and wildlife resources of the coastal plain . . .." <u>Id.</u> (emphasis added). The use of the adjective "continuing" in the same purpose section, and its omission from the specific provision authorizing exploratory activity, is significant. Moreover, as explained in some detail above, the authorization of exploratory activity was clearly embedded in a tightly-scripted process "culminating," as the Senate Report put it, in a Secretarial report to Congress that would include a Secretarial recommendation as to whether "further exploration . . . within the coastal plain should be permitted." 16 U.S.C. § 3142(h)(6).[5]

In fact, the Secretary's Report did consider, as one alternative, authorizing further exploration without leasing as part of his 1987 recommendations to Congress in the final section 1002(h) report. The Introduction to the Report (Chapter I, p. 4) states:

> The first seven chapters of this report also constitute a legislative environmental impact statement (LEIS) pursuant to section 1506.8 of the Council on Environmental Quality's (CEQ) regulations to implement NEPA (40 CFR 1500-1508). Chapters V and VI in particular discuss and evaluate <u>five major alternatives from which the Secretary's recommendation (chapter VIII) has been derived</u>. Those alternatives <u>are for the Congress to:</u> (A) authorize full leasing of the entire 1002 area; (B) authorize leasing limited to a part of the 1002 area; <u>(C) authorize further exploration, including exploratory drilling, only</u>; (D) continue current refuge status with no further oil and gas activity allowed; and (E) designate the area as wilderness.

(emphasis added). The reference to Congress authorizing further exploration, rather than the Secretary carrying it out under existing authority, supports our reading. It is also supported by the description of Alternative C in Chapter V as a Secretarial recommendation to Congress:

---

[5] Section 1002(d)(2) does provide that the initial guidelines prescribed by the Secretary "shall thereafter be revised to reflect changes made in the baseline study and other appropriate information made available to the Secretary." 16 U.S.C. § 3142(d)(2). No time limit is expressly set on these revisions, which might suggest that the authority for exploratory activities was open-ended (though nothing we have found in either the legislative history or the section's implementation supports this), or it might simply suggest that the guidelines could be revised up to the time exploratory activities ceased before the Secretary submitted his report to Congress. We believe the latter is the best reading.

> Under this alternative, <u>the Secretary would recommend additional exploration,</u> including exploratory drilling, to permit acquisition of more data to aid the Secretary and the Congress in their decision of whether or not to authorize leasing of the 1002 area. Acquisition of additional data could be by the Government, or industry, or both.

Id. p. 101 (emphasis added). While the discussion of Alternative C in Chapter VIII of the Report does not expressly speak in terms of Congress authorizing more exploration, neither does it assume (nor even strongly imply) that the Secretary could approve more exploratory activities without Congress first providing authority to do so. It reads:

> Alternative C, which would provide for further exploration before the Congress enacts leasing authority, was rejected for several reasons.
> Without authorization for a leasing program, the private sector cannot be expected to invest financial resources in exploring the 1002 area. Incentive for additional exploration can be provided only by expected returns if commercially producible oil is discovered. This incentive exists only when leases can be acquired and subsequently developed.
> Lacking proper economic incentives, Alternative C could necessitate a Federal exploration program for the 1002 area. Such an approach has serious disadvantages. A federally funded exploration program would require substantial outlays at a time of severe Federal budget constraint. Moreover, history shows that it is unlikely that the Federal government could conduct an effective and timely exploration program. Government agencies are not geared to make large, high-risk investment decisions. The federal government has been harshly criticized for its lack of success in managing a federal exploration program for the National Petroleum Reserve in Alaska.

§ 1002(h) report at 191. In short, we believe the discussion of Alternative C in the Secretary's Report clearly assumes that a renewed exploration program would have to be authorized by Congress – further indicating that the Department has consistently viewed the section 1002 exploration program as terminating upon submission of the report.

In sum, the statute's purposes, its text, the structure and design of the study program it established, the deadlines it set for the Secretarial report and its call for that report to contain a recommendation to Congress "with respect to whether further exploration . . . should be permitted," its pertinent legislative history, and the Interior Department's contemporaneous interpretation as set out in its final rule, all lead to the conclusion that the better reading of § 1002 of ANILCA is that it was a time-limited authorization for exploratory activities in the coastal plain. Once the five year study was complete and the section 1002(h) report submitted to Congress, the authorization for exploratory activity expired, and the statute does not provide any continuing authority for additional exploratory activities in the coastal plain of the Arctic Refuge at the present time.

## Is There Any Other Available Legal Authority to Conduct Oil and Gas Exploratory Activities on the Coastal Plain?

We have examined whether any existing statutory authority other than § 1002 could serve as a basis currently for authorizing exploratory activities on the coastal plain of the Arctic Refuge.[6] The only other statutory authority we have found which might arguably apply to the coastal plain is § 1010 of ANILCA, 16 U.S.C. § 3150.[7] That section provides general authority for the Secretary to "assess the oil, gas, and other mineral potential on all public lands in the State of Alaska in order to expand the data base with respect to the mineral potential of such lands." 16 U.S.C. § 3150(a). Trying to find authority in the generic § 1010 for exploration in the coastal plain runs head-on into the well-established principle of statutory interpretation that where general and specific provisions in a statute are in conflict, "the specific will prevail." N. Singer, Vol. 2A Sutherland Statutory Construction § 46.05 at 177 (6th ed. 2000). That is, if § 1010 were to be applied to the coastal plain of the Arctic Refuge in the face of the clearly more restrictive and specific provisions of § 1002, the latter would be nullified.

Even aside from provisions in § 1010 for core and test drilling which are obviously inconsistent with § 1002's complete withdrawal of the Arctic Refuge from the mining and mineral leasing laws, § 1010 lacks § 1002's tightly-sequenced structure for approval of only a limited number of non-duplicative exploration plans in order to gather surface geological and seismic data for a specific time period, while simultaneously studying the impacts on fish and wildlife and other resources. Section 1010 also lacks § 1002's strict requirements for avoiding "significant adverse effects" to fish and wildlife and, perhaps most important, clearly is in conflict with § 1002's express reservation of the authority for Congress to make the determination "<u>whether further exploration</u> for, and the development and production of, <u>oil and gas within the coastal plain should be permitted</u> . . . ." 16 U.S.C. § 3142(h)(6) (emphasis added).

In § 1002 Congress took extraordinary pains to balance carefully all the interests in the coastal plain in designing the limited exploration program it adopted. Indeed, the coastal plain of the Arctic Refuge was one of the most contentious issues which Congress addressed in the massive, complex and far-reaching ANILCA. As the legislative history explained:

> The North Slope of Alaska presented one of the more difficult policy decisions for the Committee. The presence of the largest oil field ever discovered in the United States, the growing dependence on imported oil and the possibility that one of the nation's most important wildlife areas, the Arctic National Wildlife Range

---

[6] The prohibitions in §§ 1002(i) and 1003 of ANILCA make it unlawful to lease for oil and gas anywhere in the Arctic National Wildlife Refuge, or to conduct any oil and gas activities leading to development or production from the Refuge until otherwise authorized by an Act of Congress. 16 U.S.C. §§ 3142(i), 3143.

[7] Section 1008 of ANILCA, which provides for studies of the oil and gas potential of certain Federal lands in Alaska, does not apply on those lands where applicable law prohibits oil and gas leasing, which is the case in the Arctic National Wildlife Refuge. *Compare* ANILCA § 1003 *with* § 1008; 16 U.S.C. § 3143 *with* § 3148(a). On its face, ANILCA § 1501, 16 U.S.C. § 3231, also does not apply to the Arctic Refuge.

(ANWR), might contain large quantities of oil and gas obligated the Committee to weigh the relative importance [to] the nation of maintenance of a basically untouched wildlife habitat or the development of critically needed oil and natural gas resources.

. . . .

<u>The Committee was particularly concerned with the ANWR. In hearings and in markup, conflicting and uncertain information was presented to the Committee about the extent of oil and gas resources on the Range and the effect development and production of those reserves would have on the wildlife inhabiting the Range and the Range itself. The nationally and internationally recognized wildlife and wilderness values of the Range are described in the discussion of the Committee amendments to Title III. The Committee was determined that a decision as to the development of the Range be made only with adequate information and the full participation of the Congress.</u>

Sen. Rep. No. 96-413, supra, at 240-241 (emphasis added).

Given the degree of deliberation and specificity with which Congress addressed the process for gathering exploration data and making decisions about the future of the coastal plain, it defies reality to suggest that Congress in the very same Act took away all the restrictions in § 1002 by enacting § 1010. The much more reasonable reading of the two sections, which gives effect to the purposes and intent of ANILCA as a whole, is that the general mineral assessment provisions of § 1010 are superseded by the much more specific, and restrictive, exploration program authorized in § 1002. See generally, Sutherland Statutory Construction, supra, § 46.05.

John D. Leshy
Solicitor

EXHIBIT 54, p. 16