MICHAEL C. GERAGHTY
ATTORNEY GENERAL

David L. Bernhardt
Lawrence J. Jensen
Brownstein Hyatt Farber Schreck, LLP
1350 I Street, NW, Suite 510
Washington, D.C. 20005-3305
Telephone:  (202) 296-7353
Facsimile:  (202) 296-7009
Email:  dbernhardt@bhfs.com
          ljensen@bhfs.com
Counsel for Plaintiff State of Alaska

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| STATE OF ALASKA,<br>Plaintiff,<br><br>v.<br><br>SALLY JEWELL, in her official capacity as the United States Secretary of the Interior; DANIEL M. ASHE, in his official capacity as Director of the United States Fish and Wildlife Service; GEOFFREY HASKETT, in his official capacity as Alaska Regional Director of the Fish and Wildlife Service; THE UNITED STATES FISH AND WILDLIFE SERVICE; and THE UNITED STATES DEPARTMENT OF THE INTERIOR,<br><br>Defendants. | Case No. 3:14-cv-00048-SLG<br><br><br>**PLAINTIFF STATE OF ALASKA'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT** |

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................ 1

FACTUAL BACKGROUND ............................................................................... 2

STATUTORY FRAMEWORK ............................................................................ 4

SUMMARY JUDGMENT STANDARD ............................................................. 8

STANDARD OF REVIEW ................................................................................. 9

ARGUMENT..................................................................................................... 10

I.   Subsection 1002(e) plainly grants the Secretary open-ended
     authority to approve "exploration plans" that are consistent with her
     guidelines.............................................................................................. 11

     A.   Congress spoke directly and in detail in subsection 1002(e)
          about the extent of the Secretary's authority to approve
          exploration plans ........................................................................ 12

     B.   Congress spoke in plain and unambiguous terms in subsection
          1002(e) about the extent of the Secretary's authority to
          approve exploration plans ........................................................... 14

     C.   The intent of Congress with respect to the extent of the
          Secretary's authority to approve exploration plans is clear ........... 14

II.  Subsection 1002(e)'s grant of open-ended authority to the Secretary
     to approve exploration plans is consistent with the text and structure
     of section 1002 as a whole .................................................................... 17

     A.   The Solicitor failed to consider the words in subsection
          1002(e)(2).................................................................................... 19

     B.   The Solicitor failed to identify any ambiguity in subsection
          1002(e)(2).................................................................................... 20

     C.   The report to Congress is not an express purpose of section
          1002 to which the authorization of "exploratory activity" is
          subordinate ................................................................................. 22

     D.   The phrase "further exploration" in subsection 1002(h) does
          not include "exploratory activity." .............................................. 24

     E.   The open-ended authorization of "exploratory activity" is
          consistent with the structure and design of the study program ....... 28

i

F. The Solicitor misread the legislative history and, in any event, legislative history cannot trump the plain language of subsection 1002(e)(2) .................................................. 30

III. Consideration of the State's Plan is not time-barred ................................ 31

A. Consideration of the State's plan is not barred by 50 C.F.R. § 37.21(b) ................................................................ 32

B. Any regulation that bars consideration of the State's Plan would be invalid ............................................................ 33

CONCLUSION ..................................................................................... 34

Case 3:14-cv-00048-SLG    Document 56    Filed 09/08/14    Page 3 of 41

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Barnhart v. Sigmon Coal Co.*,
  534 U.S. 438 (2002)........................................................................................*passim*

*Bd. of Governors v. Dimension Fin. Corp.*,
  474 U.S. 361 (1986)................................................................................................ 33

*BedRoc Ltd. v. United States*,
  541 U.S. 176 (2004)................................................................................................ 15

*Caminetti v. United States*,
  242 U.S. 470 (1917)................................................................................................ 35

*Chevron v. Natural Resources Defense Council*,
  467 U.S. 837 (1984)........................................................................................*passim*

*Connecticut Nat. Bank v. Germain*,
  503 U.S. 249 (1982)................................................................................................ 17

*Defenders of Wildlife v. Browner*,
  191 F.3d 1159 (9th Cir. 1999) ............................................................................ 9, 10

*Dolan v. U.S. Postal Service*,
  546 U.S. 481 (2006)........................................................................................... 20, 21

*Fort Stewart Sch. v. Fed. Labor Relations Auth.*,
  495 U.S. 641 (1990)................................................................................................ 33

*I.N.S. v. Cardoza-Fonseca*,
  480 U.S. 421 (1987)................................................................................................ 10

*Marmolejo-Campos v. Holder*,
  558 F.3d 903 (9th Cir. 2009) (en banc) ................................................................... 9

*Morton v. Ruiz*,
  415 U.S. 199 (1974)................................................................................................ 33

*Ratzlaf v. United States*,
  510 U.S. 135 (1994)................................................................................................ 31

*Rodriguez v. United States*,
480 U.S. 522 (1987) ................................................................. 24

*Rubin v. United States*,
449 U.S. 424 (1981) ................................................................. 17

*Russello v. United States*,
464 U.S. 16 (1983) .................................................................. 25

*United Savings Ass'n v. Timbers of Inwood Forest Assoc.*,
484 U.S. 365 (1988) ................................................................. 25

*United States v. Mead Corp.*,
533 U.S. 218 (2001) .................................................................. 9

*Utility Air Regulatory Group v. E.P.A.*,
134 S. Ct. 2427 (2014) ........................................................ 22, 26

*Zimmerman v. Oregon Dep't of Justice*,
170 F.3d 1169 (9th Cir. 1999) ................................................. 10

**Statutes**

Administrative Procedures Act,
5 U.S.C. §§ 551 et seq. ........................................................... 1, 8

Alaska National Interest Lands Conservation Act ("ANILCA")
§ 402, 16 U.S.C. § 460mm-1(a) (2012) ................................... 16
§ 404, 16 U.S.C. § 460mm-3(d) (2012) .................................. 16
§ 1002, 16 U.S.C. § 3142 (2012) ...................................... *passim*
§ 1003, 16 U.S.C. § 3143 (2012) ..................................... 4, 5, 25

**Other Authorities**

50 C.F.R.
Part 37 ...................................................................................... 11
§ 37.21 ................................................................................ *passim*
§ 37.22 .................................................................................. 3, 4

D.Ak. L.R. 16.3 ........................................................................... 2

Fed. R. Civ. P. 56 ........................................................................ 8

Case 3:14-cv-00048-SLG   Document 56   Filed 09/08/14   Page 5 of 41

# INTRODUCTION

Subsection 1002(e) of the Alaska National Interest Lands Conservation Act ("ANILCA") states that the Secretary of the Interior "shall approve" any oil and gas "exploration plan" for the coastal plain of the Arctic National Wildlife Refuge ("ANWR") that is submitted for her approval by any person and that is "consistent with [her] guidelines."[1]

On September 20, 2013, in a final agency action on behalf of the Secretary, the defendant Director of the United States Fish and Wildlife Service ("FWS") refused to even consider whether the "exploration plan" that had been submitted to the Secretary for approval by the plaintiff State of Alaska ("State") on July 9, 2013, was consistent with the Secretary's guidelines. The defendant Director claimed that the Secretary's authority to approve "exploration plans" had expired, and that the State's submission was, in any event, untimely under 50 C.F.R. § 37.21(b).

The State then brought this action pursuant to the Administrative Procedures Act,[2] seeking a review of defendant Director's action, and an order setting it aside as a violation of law.[3]

The State now moves for summary judgment because: (1) by the plain and unambiguous terms of subsection 1002(e)(2), the Secretary's authority to approve

---

[1]     ANILCA § 1002(e), 16 U.S.C. § 3142(e) (2012).

[2]     5 U.S.C. §§ 551 et seq.

[3]     *See generally* ECF No. 1, Compl.

"exploration plans" has not expired; and (2) by the plain and unambiguous terms of 50 C.F.R. § 37.21(b), "exploration plans" submitted after June 6, 1984, are not barred from consideration.[4] Moreover, if 50 C.F.R. § 37.21(b) could be read to bar consideration of "exploration plans" submitted after that date, it is invalid as it would be in violation of subsection 1002(e).

## FACTUAL BACKGROUND

On July 9, 2013, the State submitted its "ANILCA Section 1002(e) Exploration Plan and Special Use Permit Application" ("Exploration Plan" or "Plan") to the Regional Director of the United States Fish and Wildlife Service ("FWS") for his approval pursuant to subsection 1002(e).[5] The Plan is based on the use of state-of-the-art, 3-Dimensional (3-D) seismic technology, which was not available when the last "exploration activity" was conducted in the coastal plain in the mid-1980s.

On July 23, 2013, the Regional Director replied to the State, stating that "[t]he statutory and regulatory authority for submitting an Exploration Plan . . . expired long ago," that the Plan "has not been submitted in accordance with 50 C.F.R. § 37.21(b)," and that, "[a]s a result, the State's Exploration Plan will not be analyzed for conformance

---

[4]     The State's motion is timely, as it was made in compliance with D.Ak. L.R. 16.3(c)(1), which requires that the plaintiff's principal brief, in the form of a motion for summary judgment, be filed no later than thirty days after the record is filed. Here, the administrative record was filed on August 12, 2014. *See* ECF No. 52, Notice of Filing Administrative Record. Thus, the State's brief is due no later than September 11, 2014.

[5]     *See* R. DOC000300–01; R. DOC000302–545.

Alaska's Memorandum in Support of Summary Judgment                    Page 2 of 35
*Alaska v. Jewell*, 3:14-CV-00048-SLG

with the" Secretary's guidelines.[6] The letter states further that its conclusions are based on "a January 18, 2001 legal memorandum to the Secretary of the Interior from the Solicitor of the Department of the Interior" (the "Memorandum").[7] Copies of the Memorandum and the Secretary's January 18, 2001 letter concurring with the Solicitor's analysis are attached to the letter.[8]

In an August 21, 2013 letter to the Director of FWS, the State requested reconsideration of the Regional Director's decision in accordance with 50 C.F.R. § 37.22(c).[9]

On September 20, 2013, the Director of FWS responded to the State's August 21, 2013 letter.[10] Although the Director acknowledged that the State's request for reconsideration was timely,[11] he stated that the Memorandum "appropriately analyzed and considered the issues," and that he expressly "adopt[s]" and "follow[s]" the

---

[6]    R. DOC000546–47.

[7]    R. DOC000546. The Memorandum is not a formal opinion of the Solicitor, which is known as an M-Opinion. It is, instead, a response to a December 14, 2000 letter from then-U.S. Representative Edward J. Markey requesting an analysis of the issue from the outgoing Secretary. *See* R. DOC000548; R. DOC000550.

[8]    *See* R. DOC000548–50 (January 18, 2001 letter); R. DOC000550–61 (Memorandum).

[9]    *See* R. DOC000562–76.

[10]    *See* R. DOC000577–86.

[11]    R. DOC000577.

Memorandum "in this appeal decision."[12] In accordance with 50 C.F.R. § 37.22(c), which states that the "Director's decision . . . constitute[s] the final administrative decision of the Secretary in the matter," the Director denied the State's request for reconsideration, and affirmed the decision of the Regional Director.[13]

## STATUTORY FRAMEWORK

Section 1003 of ANILCA prohibits the "production of oil and gas from the Arctic National Wildlife Refuge," including that portion of it known as the coastal plain, and states that "no leasing or other development leading to the production of oil and gas from [ANWR] shall be undertaken until authorized by an Act of Congress."[14] Section 1002(i) states further that "all public lands within the coastal plain are withdrawn . . . from the operation of the mineral leasing laws," which govern the leasing of oil and gas on public lands.

Section 1002, however, creates a special study program for the area of ANWR known as the coastal plain or 1002 Area, due to its immense oil and gas potential. Subsection 1002(c) requires the Secretary to "conduct a continuing study of the fish and wildlife . . . of the coastal plain," which is to include an analysis of the "impacts of oil

---

[12]     R. DOC000581 n.2.

[13]     R. DOC000586.

[14]     ANILCA § 1003, 16 U.S.C. § 3143 (2012).

and gas exploration, development, and production" on the fish and wildlife resources, if such exploration, development, and production were to be allowed.

In tandem with the requirement to conduct the "continuing study," subsection 1002(e) authorizes the conduct of what it terms oil and gas "exploratory activity" within the coastal plain. "Exploratory activity" is defined as "surface geological exploration or seismic exploration." By its terms, such activity does not include the drilling of exploratory wells. Moreover, in light of section 1003, it cannot lead to the "production of oil and gas" without further authorization from Congress.

Subsection 1002(e)(1) states that "any person . . . may present one or more plans for exploratory activity (hereinafter in this section referred to as 'exploration plans') to the Secretary [of the Interior] for approval." Subsection 1002(e)(2) then mandates that the Secretary "shall approve [any such exploration] plan" if she determines that it is "consistent with [her] guidelines."

The purpose of section 1002, as stated in subsection 1002(a), is three-fold. It is to:

1.  "provide for a comprehensive and continuing inventory and assessment of the fish and wildlife resources of the coastal plain;"

2.  provide for an "analysis of the impacts of oil and gas exploration, development and production;" and

3.  "authorize exploratory activity within the coastal plain in a manner that avoids significant adverse effects on the fish and wildlife and other resources."

To achieve its objectives, section 1002 requires the Secretary to perform four tasks. Those tasks are:

1.     Baseline Study:  Subsection 1002(c) requires the Secretary to "conduct a continuing study of the fish and wildlife . . . of the coastal plain and their habitat." In conducting the study, the Secretary shall, among other things, "assess the impacts of human activities and natural processes on the fish and wildlife and their habitats," and "analyze the potential impacts of oil and gas exploration, development, and production on such wildlife and habitat." "Within eighteen months after the enactment of [section 1002], the Secretary shall publish the results of the study as of that date and shall thereafter publish such revisions thereto as are appropriate as new information is obtained."

2.     Guidelines:  Subsection 1002(d) requires the Secretary "[w]ithin two years after [the enactment of section 1002]," to establish by regulation "initial guidelines governing the carrying out of exploratory activities." The guidelines must "include such prohibitions, restrictions, and conditions on the carrying out of exploratory activities as the Secretary deems necessary or appropriate to ensure that the exploratory activities do not significantly adversely affect the fish and wildlife, their habitats, or the environment." They must specifically include:

(1)     "a prohibition on the carrying out of exploratory activity during caribou calving and immediate post-calving seasons or during any other period in which human activity may have adverse effects;"

(2)    "temporary or permanent closing of appropriate areas to such activity;"

(3)    "specification of the support facilities, equipment, and related manpower that is appropriate in connection with exploratory activity; and"

(4)    "requirements that exploratory activities be coordinated in such a manner as to avoid unnecessary duplication."[15]

"The initial guidelines shall thereafter be revised to reflect changes made in the baseline study and other appropriate information made available to the Secretary."[16]

3.    <u>Exploration Plans:</u>  Subsection 1002(e) states that "[a]fter the initial guidelines are prescribed, . . . any person . . . may submit one or more plans for exploratory activity . . . to the Secretary for approval," but "no plan shall be approved during the two-year period following December 2, 1980." Upon receipt of "any exploration plan for approval," the Secretary is required to "promptly publish notice of the application and the text of the plan in the Federal Register and newspapers of general circulation in the State," and to "hold at least one public hearing in the State for purposes of receiving the comments and views of the public on the plan." The Secretary is required to "determine, within one hundred and twenty days after any plan is submitted for

---

[15]    *Id.* § 1002(d)(1)(A)–(D).

[16]    *Id.* § 1002(d)(2).

approval, if the plan is consistent with the guidelines," and, if she so determines, the Secretary "*shall* approve the plan."[17]

4. <u>Report to Congress:</u> Subsection 1002(h) requires the Secretary, "[n]ot earlier than five years after the enactment of [ANILCA] and not later than five years and nine months after such date, [to] prepare and submit to Congress a report containing," among other things, "an evaluation of the adverse effects that the carrying out of further exploration for, and the development and production of, oil and gas within [the coastal plain] will have on" the fish and wildlife, and "the recommendation of the Secretary with respect to whether further exploration for, and the development and production of, oil and gas within the coastal plain should be permitted, and, if so, what additional legal authority is necessary to ensure that the adverse effects of such activities on fish and wildlife, their habitats, and other resources are avoided or minimized."

## SUMMARY JUDGMENT STANDARD

Pursuant to Fed. R. Civ. P. 56(a), "[t]he Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." As this is a record review case under the Administrative Procedures Act, there are no facts in dispute. As demonstrated below, the State is entitled to judgment as a matter of law.

---

[17] *Id.* § 1002(e) (emphasis added).

## STANDARD OF REVIEW

This case requires the Court to review defendants' interpretation of a statute that they administer and of the regulations that implement that statute. The two-step process for judicial review of an administrative agency's interpretation of a statute that it administers is set forth in *Chevron v. Natural Resources Defense Council*.[18] As the Ninth Circuit explained in *Defenders of Wildlife v. Browner*, the process is as follows:

> Under the first step, we employ "traditional tools of statutory construction" to determine whether Congress has expressed its intent unambiguously on the question before the court. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." If, instead, Congress has left a gap for the administrative agency to fill, we proceed to step two. At step two, we must uphold the administrative [interpretation or] regulation unless it is "arbitrary, capricious, or manifestly contrary to the statute."[19]

When Congress has spoken clearly and unambiguously, the judicial inquiry ends with step one.[20] The court employs the "traditional tools of statutory construction" and first

---

[18]     467 U.S. 837, 842–43 (1984).

[19]     191 F.3d 1159, 1162 (9th Cir. 1999). Of course, even if there were a gap here, which, as demonstrated below, is not the case, neither the Memorandum, nor the decision which is based on it, would be entitled to full *Chevron* deference, as they do not constitute an agency rule adopted through the notice and comment procedure. *See United States v. Mead Corp.*, 533 U.S. 218 (2001); *see also Marmolejo-Campos v. Holder*, 558 F.3d 903, 908 (9th Cir. 2009) (en banc) ("Not every agency interpretation of its governing statute is entitled to *Chevron* deference, however.").

[20]     *Defenders of Wildlife*, 191 F.3d at 1164.

considers the words that Congress used.[21] The entire statute may provide context for divining congressional intent.[22] When the court determines that Congress has left "no gap" for the agency to fill, the statute is interpreted *de novo*, and no deference is accorded to the agency's interpretation:

> The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent. If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect.[23]

Agency regulations that ignore Congress' clear intent must also be set aside.[24]

## ARGUMENT

The State brought this action to have defendants' unlawful refusal to consider its Exploration Plan set aside. Defendants refused to consider the Plan based on the Memorandum, which concluded that "the statutory authority to permit exploratory activity in the Arctic Refuge coastal plain expire[d]" "with the submission" of the

---

[21]    *Id.* (quoting *Chevron*, 467 U.S. at 843 n.9).

[22]    *Defenders of Wildlife*, 191 F.3d at 1164 (citing *Zimmerman v. Oregon Dep't of Justice*, 170 F.3d 1169, 1173 (9th Cir. 1999)).

[23]    *Chevron*, 467 U.S. at 843 n.9 (collecting cases, internal citations omitted.) *See also I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 446 (1987) (holding that when an issue involves a "pure question of statutory construction" requiring analysis of the plain language of a statute, *Chevron*-style deference does not attach during judicial review).

[24]    *Chevron*, 467 U.S. at 843 n.9 ("The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent.").

Case 3:14-cv-00048-SLG    Document 56    Filed 09/08/14    Page 15 of 41

subsection 1002(h) report to Congress in 1987.[25] Defendants also claimed that the State's "Exploration Plan was submitted too late and could not be considered by the Regional Director and still be in compliance with 50 C.F.R. Part 37."[26] Measured against the plain language of both subsection 1002(e) and the regulations, and taking into account the text and structure of section 1002 as a whole, defendants' reasons for refusing to consider the State's Plan are in violation of law, as they violate the right of the State, which is a "person" for purposes of subsection 1002(e), to have its exploration plan reviewed and approved if it is consistent with the Secretary's guidelines. Defendants' refusal to consider the Plan must therefore be set aside.

I.     **Subsection 1002(e) plainly grants the Secretary open-ended authority to approve "exploration plans" that are consistent with her guidelines.**

"[I]n all statutory construction cases," a court "must begin with the language of the statute."[27] As the Supreme Court stated in *Chevron*:

> First, always, is the question whether Congress has spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter, for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.[28]

---

[25]     R. DOC000554.

[26]     R. DOC000584.

[27]     *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450 (2002).

[28]     467 U.S. at 842–43.

### A.  Congress spoke directly and in detail in subsection 1002(e) about the extent of the Secretary's authority to approve exploration plans.

The "precise question at issue" in this case is the extent of the Secretary's authority to approve exploration plans. Congress spoke directly to this issue in great detail in subsection 1002(e)(2). Subsection 1002(e)(2) establishes a multi-step process that directs the Secretary's approval authority, carefully limits the Secretary's discretion, and concludes with a requirement that the Secretary approve any plan that is consistent with her guidelines. The Secretary is required to:  (1) "promptly publish the notice of the application and the text of the plan in the Federal Register and newspapers of general circulation in the State;" (2) "hold at least one public hearing in the State for purposes of receiving the comments and views of the public on the plan;" (3) "determine, within one hundred and twenty days after any plan is submitted for approval, if the plan is consistent with the guidelines established under subsection (d);" and (4) "[i]f the Secretary determines that the plan is consistent, [s]he *shall* approve the plan."[29]

Subsection 1002(e)(2) states in full as follows:

> Upon receiving any exploration plan for approval, the Secretary *shall* promptly publish notice of the application and the text of the plan in the Federal Register and newspapers of general circulation in the State. The Secretary *shall* determine, within one hundred and twenty days after any plan is submitted for approval, if the plan is consistent with the guidelines established under subsection (d). If the Secretary determines that the plan is consistent, he *shall* approve the plan:  except that no plan *shall* be approved during the two-year period following the date of enactment of this Act. Before making

---

[29]    ANILCA § 1002(e)(2) (emphasis added).

Alaska's Memorandum in Support of Summary Judgment          Page 12 of 35
*Alaska v. Jewell*, 3:14-CV-00048-SLG

the determination, the Secretary *shall* hold at least one public hearing in the State for purposes of receiving the comments and views of the public on the plan. The Secretary *shall* not approve of any plan submitted by the United States Geological Survey unless he determines that (1) no other person has submitted a plan for the area involved which meets established guidelines and (2) the information which would be obtained is needed to make an adequate report under subsection (h). The Secretary, as a condition of approval of any plan under this section—

(A) *may* require that such modifications be made to the plan as he considers necessary and appropriate to make it consistent with the guidelines;

(B) *shall* require that all data and information (including processed, analyzed and interpreted data or information) be submitted to the Secretary; and

(C) *shall* make such data and information available to the public except that any processed, analyzed and interpreted data or information *shall* be held confidential to the Secretary for period of not less than two years following any lease sale include the area from which the information was obtained.[30]

---

[30] *Id.* (emphasis added). In addition to establishing in subsection 1002(e)(2) a multi-step process for the exercise of the Secretary's approval authority, Congress also: specified in subsection 1002(d) the content of the guidelines to which exploration plans must conform if they are to be approved; authorized the Secretary in subsection 1002(f) to modify exploration plans, if necessary, even after she initially approves them; and authorized the Secretary in subsection 1002(g) to assess civil penalties for any violations of exploration plans approved by her. Notably absent from this carefully crafted scheme is any subsection or provision that limits the requirement that the Secretary review and approve exploration plans based on when such plans are filed.

**B. Congress spoke in plain and unambiguous terms in subsection 1002(e) about the extent of the Secretary's authority to approve exploration plans.**

In addition to speaking directly and in detail on the Secretary's authority to approve exploration plans, Congress also spoke plainly and unambiguously. Subsection 1002(e)(2) states that "[a]fter the initial guidelines are prescribed under subsection (d) of this section, any person . . . may submit one or more plans for exploratory activity," and that if "the Secretary determines . . . [that] the plan is consistent with the guidelines established under subsection (d) of this section, . . . [the Secretary] shall approve the plan." That language by itself is unambiguous. It cannot possibly be construed under any canon of statutory construction to restrict the Secretary's authority to approve exploration plans to any timeframe, let alone the period prior to the submission of the subsection 1002(h) report to Congress. Significantly, neither the Director's decision, nor the Memorandum on which it is based, identifies any ambiguity or ambiguous terms in subsection 1002(e).

**C. The intent of Congress with respect to the extent of the Secretary's authority to approve exploration plans is clear.**

In subsection 1002(e)(2), Congress clearly expressed its intent on the extent of the Secretary's authority to approve exploration plans. It specified the public process that the Secretary must follow, the substantive criteria that must be satisfied before approval is to be given, the schedule for when approval is to be given—i.e., not earlier than December 2, 1982, and "within one hundred and twenty days after any plan is submitted for approval," and that the Secretary "shall approve" any "exploration plan" that she

Alaska's Memorandum in Support of Summary Judgment                Page 14 of 35
*Alaska v. Jewell*, 3:14-CV-00048-SLG

determines is consistent with her guidelines. Indeed, subsection 1002(e)(2) contains ten specific restrictions (or directions) on the exercise of the Secretary's approval authority.

Conspicuously missing from these detailed restrictions is any restriction on the exercise of the Secretary's approval authority subsequent to the submission of the subsection 1002(h) report to Congress. In light of the detailed restrictions, it is unreasonable to assume, as defendants apparently do, that Congress, in its crafting of subsection 1002(e)(2), intended such a restriction but simply forgot to include it.

The Solicitor stated in his Memorandum that "the primary argument against expiration of the statutory authority for 'exploratory activity' . . . rests mainly on the fact that nowhere in the section is there any express statement of expiration."[31] While that is a good argument, it is not the primary one. As explained above, the primary argument is that Congress spoke directly, in detail and unambiguously about the extent of the Secretary's authority to approve exploration plans. What Congress said made it clear that the authority was open-ended. The Supreme Court has stated that "[t]he preeminent canon of statutory construction requires [courts] to presume that [the] legislature says in a statute what it means and means in a statute what it says there. Thus, [a court's] inquiry begins with the statutory text, and ends there as well if the text is unambiguous."[32] With respect to the extent of the Secretary's authority to approve exploration plans, the text of

---

[31]    R. DOC000558.

[32]    *BedRoc Ltd. v. United States*, 541 U.S. 176, 183 (2004) (citation omitted) (internal quotation marks omitted).

subsection 1002(e)(2) makes clear that Congress intended that the Secretary, after following the prescribed public process, approve any plan that is consistent with her guidelines, without regard to the date of its submission.

The only time limits that were placed on the exercise of the Secretary's authority were that she not approve any plan "during the two-year period following December 2, 1980," and that she approve any plan that is consistent with her guidelines "within one hundred and twenty days" of its submission. Given the detailed restrictions that Congress imposed on the exercise of the Secretary's approval authority, Congress' omission of a restriction on the approval of plans after the submission of the subsection 1002(h) report to Congress must be presumed deliberate—i.e., it must be presumed that Congress did not intend such a restriction.[33] As the Supreme Court stated in *Barnhart*: "Congress

---

[33]     Significantly, Congress placed time limits on other authorized or required activities in ANILCA. *See, e.g.*, ANILCA § 402(a), 16 U.S.C. § 460mm-1(a) (2012) (the Secretary "shall, within five years of December 2, 1980, develop a land use plan for each such area . . . ."); ANILCA § 404(d), 16 U.S.C. § 460mm-3(d) (2012) ("If an application for a patent is filed . . . after September 30, 1982, the validity of each claim shall be determined as of the date of the patent application or September 30, 1982, whichever is earlier."); *id.* § 404(f) ("The holder of any unperfected mining claim which was, prior to November 16, 1978, located, recorded, and maintained . . . shall be entitled during a two-year period after the date that the Secretary exercises his authority . . . to open an area containing such claim to mining . . . ."); *id.* § 1002(c) ("Within eighteen months after December 2, 1980, the Secretary shall publish the results . . . ."); *id.* § 1002(d)(1) ("Within two years after December 2, 1980, the Secretary shall by regulation establish initial guidelines . . . ."); *id.* § 1002(e)(2) ("If the Secretary determines that the plan is so consistent, he shall approve the plan: except that no plan shall be approved during the two-year period following December 2, 1980."); *id.* § 1002(h) ("Not earlier than five years after December 2, 1980, and not later than five years and nine months after such date, the Secretary shall prepare and submit to Congress a report . . . .").

wrote the statute in a manner that provides [that the Secretary shall approve any exploration plans that are consistent with her guidelines]. If Congress meant to [place an expiration date on that authority], it could have done so clearly and explicitly."[34]

Because the intent of Congress on "the precise question at issue" in this case "is clear, that is the end of the matter."[35] "'When the words of a statute are unambiguous, then . . . judicial inquiry is complete.'"[36]

## II. Subsection 1002(e)'s grant of open-ended authority to the Secretary to approve exploration plans is consistent with the text and structure of section 1002 as a whole.

Although the meaning of subsection 1002(e) is plain—thus relieving the court of any need to search further for keys to its meaning—it is also plain that subsection 1002(e)'s grant of open-ended authority to the Secretary to approve exploration plans is consistent with the text and structure of section 1002 as a whole. Subsection 1002(c) requires the Secretary to "conduct a *continuing* study of the fish and wildlife . . . of the coastal plain and their habitat."[37] That "continuing study" is to include an analysis of "the potential impacts of oil and gas exploration, development, and production on such wildlife and habitats." The initial results of that study were to be reported "within

---

[34]      534 U.S. at 454.

[35]      *Chevron*, 467 U.S. at 842–43.

[36]      *Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 254 (1982) (quoting *Rubin v. United States*, 449 U.S. 424, 430 (1981)).

[37]      ANILCA § 1002(c) (emphasis added).

eighteen months after December 2, 1980," and the Secretary is directed to "thereafter publish such revisions thereto as are appropriate as new information is obtained."

In connection with the obligation to conduct the "continuing study," subsection 1002(e) authorizes "any person" to gather information about the oil and gas resource in the coastal plain through the conduct of "exploratory activity," provided it is done in strict accordance with the Secretary's environmentally-protective guidelines. No time limits are placed on when that "exploratory activity" may be conducted. The open-ended authority to authorize "exploratory activity" supports the Secretary's ability to fulfill her obligation to conduct the "continuing study," as it allows the gathering of up-to-date information about the extent and location of the oil and gas resources in the coastal plain. The more these resources are reliably delineated with the assistance of advances in technology, the better will be the understanding of the impacts any oil and gas development and production would have on the fish and wildlife resources in the area.

In contrast, the Memorandum on which defendants rely attempts to paint section 1002 as establishing "a very detailed, carefully structured three-stage sequential process," whose ultimate (and singular) purpose was to gather information for the one-time report to Congress detailed in subsection 1002(h), and whose authorization of "exploratory activity" culminated and sunsetted with the submission of that report.[38] For numerous reasons, however, which are explained in detail below, the Solicitor's reading of section

---

[38]     R. DOC000549, DOC000551–52.

1002 is plainly in error and must be rejected, particularly in light of the fact that it would require the Court to re-write the plain language in subsection 1002(e) to make it say something that it does not.

A.     The Solicitor failed to consider the words in subsection 1002(e)(2).

In developing his interpretation of section 1002 in the Memorandum, the Solicitor ignored the cardinal rule of statutory construction; he did not start, as he was required to do, with the words of the statute that specifically address "the precise question at issue." Indeed, the Solicitor did not even quote in full the relevant language in subsection 1002(e)(2), let alone pause to consider its import. For that reason alone, his legal analysis should be rejected as flawed.

While the Solicitor acknowledged at the beginning of his analysis that "[t]here are two possible answers" to the question of whether the Secretary currently has authority to approve exploration plans, he simply asserted, without explaining what the other "answer" is and why it should be rejected, that "the far better[ ] reading of the statute is that . . . [w]ith the submission of the [subsection 1002(h) report to Congress], the statutory authority to permit exploratory activity on the Arctic Refuge coastal plain has expired."[39] However, it is impossible to determine what the "better reading" of a statute is without first identifying, and then comparing, the possible readings in light of what the words of the statute actually say on the matter at issue.

_____

[39]     R. DOC000554.

**B.    The Solicitor failed to identify any ambiguity in subsection 1002(e)(2).**

Instead of pausing to examine the words in subsection 1002(e), the Solicitor presumed subsection 1002(e) to be ambiguous and turned immediately to an examination of section 1002 as a whole. He examined "the statute's purposes, its text, [and] the structure and design of the study program," all in an attempt to prove that the unambiguously open-ended grant of authority in subsection 1002(e) had expired by implication.[40] However, without identifying any words or phrases in subsection 1002(e) that are ambiguous, there is no basis for the interpretive problem that the Solicitor purported to solve by examining section 1002 as a whole. As noted above, when the intent of Congress is clear, as is the case with respect to the extent of the Secretary's authority to approve exploration plans, the "judicial [and the agency] inquiry is complete." It is not appropriate to look beyond what the words themselves have to say on the matter at issue in an effort to find ambiguities elsewhere that then have to be resolved through an examination of the statute as a whole.

The proper application of the principle of examining the statute as a whole is well illustrated by *Dolan v. U.S. Postal Service*.[41] In that case, the phrase that was at issue was "negligent transmission." The Supreme Court noted that, "considered in isolation," the

---

[40]    R. DOC000559.

[41]    546 U.S. 481 (2006).

phrase "could embrace a wide range of negligent acts."[42] In such a circumstance, it explained that "[t]he definition of the words in isolation . . . is not necessarily controlling in statutory construction," and that "interpretation of a [such a] word or phrase depends upon reading the whole statutory text, [and] considering the purpose and context of the statute."[43] It then found from an examination of those factors a basis for narrowing the meaning of the phrase in a way that limited the "range of negligent acts" embraced by it.

This case, however, does not present such a circumstance with regard to the "exploratory activity" authorized in subsection 1002(e)—it is an unambiguous, statutorily defined term of art for section 1002. Nor did the Solicitor identify any other words or phrases in subsection 1002(e)(2), which, when considered in isolation, are ambiguous on the question of whether the Secretary may approve exploration plans after the submission of the subsection 1002(h) report to Congress, and that thus need to be considered in the context of section 1002 as a whole to be understood.

Instead, the Solicitor launched into his examination of section 1002 as a whole, untethered to any words whose meaning he was seeking to discern. In other words, he applied the canon both backwards and upside down. Instead of acknowledging that the plain and unambiguous language of subsection 1002(e)(2) was not dependent on, and in fact could aid in the resolution of, whatever other ambiguity he purported to find in

---

42      *Id.* at 486.

43      *Id.*

section 1002 as a whole, he began with a broad analysis of the statute and used inferences of ambiguity from that analysis to justify a re-writing of subsection 1002(e)(2) to make it say something that it does not—i.e., that the Secretary may not approve exploration plans after submission of the subsection 1002(h) report to Congress.

As the Supreme Court has recently reaffirmed, however, it is a "core administrative-law principle that an agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate. . . . Instead, the need to rewrite clear provisions of the statute should have alerted the agency that it had taken a wrong interpretative turn."[44] Here, the need to re-write the plain and unambiguous terms of subsection 1002(e) to make them fit with his reading of section 1002 as a whole should have alerted the Solicitor (and the Secretary, who relied wholly on his analysis) that he had taken "a wrong interpretive turn."

### C. The report to Congress is not an express purpose of section 1002 to which the authorization of "exploratory activity" is subordinate.

A key assumption in the Solicitor's reading of section 1002 as a whole was that the overarching purpose of section 1002—i.e., the ultimate reason it was enacted—was to provide for the gathering of the information necessary for the report to Congress. From this assumption flowed his conclusion that once the "report [was] submitted to Congress, the authorization for exploratory activity [necessarily] expired"[45]—even though section

---

[44]     *Utility Air Regulatory Group v. E.P.A.*, 134 S. Ct. 2427, 2446 (2014).

[45]     *See* R. DOC000559.

1002 nowhere says that. The fatal flaw in his conclusion, however, is that his assumption about the primacy of the subsection 1002(h) report to Congress as a purpose of section 1002 is not supported by section 1002's own description of its purposes.

Subsection 1002(a) identifies three purposes for section 1002:

1.  to "provide for a comprehensive and continuing inventory and assessment of the fish and wildlife resources of the coastal plain;"

2.  to provide for "an analysis of the impacts of oil and gas exploration, development and production;" and

3.  to "authorize exploratory activity within the coastal plain in a manner that avoids significant adverse effects on the fish and wildlife and other resources."

Conspicuously missing from that list is any mention of the report to Congress, or that any of these purposes are temporary in nature. As the report to Congress is not even identified as one of the express purposes of section 1002—let alone as its overarching purpose to which the authorization of "exploratory activity" is subordinate—the Solicitor's key assumption about its prominence is ill-founded, and the conclusion that he draws about the expiration of authority for "exploratory activity" based on that assumption must be rejected.[46]

---

[46]     Even if the reference to "an analysis of the impacts of oil and gas exploration, development, and production" is read as a veiled reference to the report to Congress, it is just one of three purposes, not the primary one to which the others are subordinate.

### D. The phrase "further exploration" in subsection 1002(h) does not include "exploratory activity."

Subsection 1002(h) required the Secretary to include in his report to Congress a recommendation "with respect to whether further exploration for, and the development and production of, oil and gas within the coastal plain should be permitted." The Solicitor felt that the language referring to the permitting of "further exploration" was "of particular note;" he concluded that it "seems to clearly indicate that Congress intended to reserve for itself the decision whether 'further exploration' [including further 'exploratory activity'] of the coastal plan was warranted, once the results of the § 1002 study were reported to it."[47] The Solicitor's analysis, however, mistakenly conflates the phrase "further exploration" with the defined term "exploratory activity."

When interpreting a statute, a court must take note when "Congress includes particular language in one section of a statute but omits it in another . . . ."[48] In this case, subsection 1002(e) consistently uses the term "exploratory activity" (which is a defined term), while subsection 1002(h) meaningfully varies to the term "further exploration" (which is not a defined term). The Supreme Court has explained that "it is a general principle of statutory construction that when 'Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or

---

[47]     R. DOC000555.

[48]     *Rodriguez v. United States*, 480 U.S. 522, 525 (1987).

exclusion.'"[49] Applying that principle here, it must be presumed that Congress had something different than "exploratory activity" in mind when it asked for a recommendation in subsection 1002(h) on whether "further exploration" should be allowed. That something different was naturally the drilling of exploratory wells—the activity necessary for both the next step of exploration and the actual production and development of oil and gas. The drilling of exploratory wells in the coastal plain had been prohibited by section 1003's ban on oil and gas development in ANWR, and was not included in the definition of "exploratory activity," and so it would make sense that Congress would want to reserve to itself the decision whether such "further exploration" should be allowed, based on the information provided in the subsection 1002(h) report.

The Supreme Court has stated that where "only one of the permissible meanings [of an ambiguous phrase] produces a substantive effect that is compatible with the rest of the law," that is the meaning that must be honored.[50] In this case, reading "further exploration" to mean exploration involving the drilling of exploratory wells is the only "permissible meaning" that is "compatible with the rest of the law." It allows Congress to decide whether "further exploration" of a type that had been prohibited, and whose effects on fish and wildlife could be quite different from "exploratory activity," should be

---

[49]    *Barnhart*, 534 U.S. at 452 (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)).

[50]    *United Savings Ass'n v. Timbers of Inwood Forest Assoc.*, 484 U.S. 365, 371 (1988).

allowed, while permitting "exploratory activity," which had already been specifically authorized, and which, by definition, was not allowed to have a significant adverse effect on the fish and wildlife, to continue.

Conversely, reading "further exploration" to encompass "exploratory activity" would produce "a substantive effect that is [in]compatible with the rest of the law," as it would require a re-writing of subsection 1002(e)(2) to make it say something that it does not—i.e., that the Secretary's authority to approve "exploration plans" expires with the submission of the report to Congress. As the Supreme Court has recently explained, "[a]n agency has no power to 'tailor' legislation to bureaucratic policy goals by rewriting unambiguous statutory terms." If its interpretation of a word or a phrase in the statute requires an agency to "rewrite clear provisions of the statute" (as is the case with the Solicitor's interpretation of the phrase "further exploration"), that is a signal that the agency has "taken a wrong interpretative turn."[51]

Further support for reading the phrase "further exploration" to refer exclusively to exploration that involves the drilling of exploratory wells is found in subsection 1002(h) itself. That subsection requires the report to Congress to contain two things with respect to "further exploration." First, it requires the report to contain "an evaluation of the adverse effects that the carrying out of further exploration for, and the development and production of, oil and gas . . . will have on fish and wildlife, their habitats, and other

---

[51]    *See Utility Air Regulatory Group*, 134 S. Ct. at 2446.

Case 3:14-cv-00048-SLG    Document 56    Filed 09/08/14    Page 31 of 41

resources." This requirement makes no sense if "further exploration" is read to include "exploratory activity." Congress already knew that "exploratory activity," by definition, was not having significant adverse effects on the fish and wildlife—because any such activity was conditioned upon compliance with the guidelines that Congress itself instructed be put in place in section 1002(d) to protect these values. What Congress did not know was the type and nature of the "adverse effects" that the exploration of the kind it had prohibited—i.e., exploration involving the drilling of exploratory wells—would have on the fish and wildlife were it to be authorized.

Second, subsection 1002(h) requires the report to identify "what additional legal authority is necessary to ensure that adverse effects [of further exploration for, and the development and production of, oil and gas] on fish and wildlife, their habitats, and other resources are avoided or minimized." This requirement also makes no sense if "further exploration" is read to include "exploratory activity." In subsection 1002(g), Congress had already provided the Secretary with adequate legal authority to insure that the "adverse effects" of "exploratory activity" would be "avoided or minimized," including the authority to suspend such activity as new information about its effects became available, and to impose administrative fines for failures to carry out such activity in accordance with an approved exploration plan. What Congress did not know was what "additional legal authority" might be necessary to "avoid or minimize" the "adverse effects" of the drilling of exploratory wells, should it decide to lift the ban on that type of exploration.

Finally, it is significant that in subsection 1002(h) the words "further exploration" never appear in isolation, but always as part of the following phrase: "further exploration for, and the development and production of, oil and gas." Under the doctrine of *noscitur a sociis*, this is a strong indication that the phrase "further exploration" was meant to refer to the type of exploration that normally occurs in conjunction with the development and production of oil and gas—i.e., the drilling of exploratory wells.

### E. The open-ended authorization of "exploratory activity" is consistent with the structure and design of the study program.

The Solicitor described section 1002 as "creating a very detailed, carefully structured three-stage sequential process"—i.e., baseline study, exploration activity, and report—"for obtaining [the information for the report to Congress] and then preparing the Secretary's report and recommendations to Congress."[52] He concluded from that self-serving description that "the exploration activities authorized in § 1002 were for the specific [and sole] purpose of gathering information for the section 1002(h) report to Congress," and that the authorization for "exploratory activity" must therefore have expired with the submission of the report.[53] But the fact that Congress wanted a report by a date certain, and that the "exploratory activity" authorized by subsection 1002(e)(2) played a role in gathering the information necessary for the report, does not mean that the report to Congress was the only purpose to be served by the authorization of "exploratory

---

[52]     R. DOC000552.

[53]     R. DOC000555.

activity," or that the authorization for such activity necessarily expired once the report was submitted. The only way to reach that conclusion, which is nowhere stated in section 1002, is to ignore (as the Solicitor did) the fact, as explained above, that the report to Congress is not even listed as a separate purpose of section 1002, let alone as its overarching purpose; to ignore (as the Solicitor did) the fact, as explained above, that the authorization of "exploratory activity" is listed as a stand-alone purpose of section 1002; and to ignore (as the Solicitor did) the plain and unambiguous language of subsection 1002(e)(2) requiring the Secretary to approve any exploration plan that is consistent with her guidelines, without regard to the date of its submission (after the first date the Secretary was allowed to receive plans).

Moreover, given the significance of the oil and gas resource underlying the coastal plain, Congress had strong incentive both for insuring that it received an initial report by a date certain, to determine whether to allow the development and production of the resource, and for insuring as part of the "continuing study" that it mandated in subsection 1002(c), that information about the resource could continue to be gathered and evaluated through the conduct of "exploratory activity." Indeed, it is difficult to understand how the Secretary, as part of her "continuing study" under subsection 1002(c) could "analyze the potential impacts of oil and gas exploration, development, and production" on the "fish and wildlife resources of the coastal plain" without access to current information about the extent and location of the oil and gas resource obtained through "exploratory activity."

**F.     The Solicitor misread the legislative history and, in any event, legislative history cannot trump the plain language of subsection 1002(e)(2).**

The Solicitor stated that "[t]he legislative history strongly supports [his] interpretation" that "the exploration activities authorized in § 1002 were for the specific purpose of gathering information for the section 1002(h) report, and that the Secretary's authority to carry out further exploration after that is not permitted without the further consent of Congress."[54] That is not true.

The legislative history cited by the Solicitor shows only that Congress clearly wanted some "exploratory activity" to be conducted prior to the submission of the 1002(h) report so that the results could be reflected in the report. That unremarkable observation is confirmed by section 1002 itself. Subsection 1002(h) states that the report must contain "the identification by means other than drilling of exploratory wells [i.e., through exploratory activity] of those areas within the coastal plain that have oil and gas production potential." In addition, subsection 1002(e)(2) authorizes the United States Geological Survey to submit an exploration plan, but then directs the Secretary to approve such a plan only if "the information which would be obtained is needed to make an adequate report under subsection (h)"—i.e., only if the information obtained by the exploratory activities of private parties would not be sufficient to "make an adequate report."

---

[54]     *Id.*

Alaska's Memorandum in Support of Summary Judgment          Page 30 of 35
*Alaska v. Jewell*, 3:14-CV-00048-SLG

What the legislative history cited by the Solicitor does not address is whether the open-ended authorization of exploratory activity in subsection 1002(e)(2) was meant to expire upon submission of the report to Congress. On that precise issue, the legislative history is silent. This silence falls far short of the "strong support" the Solicitor claims the legislative history provides.

In any event, even if the legislative history could be construed as the Solicitor claimed, the Supreme Court has explained that statements in the legislative history "cannot amend the clear and unambiguous language of a statute." "We see no reason," said the Court, "to give greater weight to [statements in the legislative history] than to the collective views of both Houses, which are expressed in the unambiguous statutory text," which, in this case, is found in subsection 1002(e)(2).[55] "We do not resort to legislative history to cloud a statutory text that is clear."[56]

## III.     Consideration of the State's Plan is not time-barred.

Defendants also refused to consider the State's exploration plan because, in their view, the State submitted it too late in accordance with the restrictions in 50 C.F.R. § 37.21(b). However, in an effort to avoid having to consider the State's Plan, defendants misread their own regulations.

---

[55]     *See Barnhart*, 534 U.S. at 457.

[56]     *Ratzlaf v. United States*, 510 U.S. 135, 147–48 (1994).

**A.    Consideration of the State's plan is not barred by 50 C.F.R. § 37.21(b).**

Section 37.21(b) of chapter 50 of the Code of Federal Regulations reads:

> To be considered, exploration plans covering the period from the inception of the program through May 31, 1986, or any portions thereof, must be received by the Regional Director during normal business hours on May 20, 1983; exploration plans covering exploratory activities other than seismic exploration for the period from June 1, 1984, through May 31, 1986, or any portions thereof, must be received by the Regional Director during normal business hours on April 2, 1984; and exploration plans covering, but not limited to, seismic exploration for the period from October 1, 1984, through May 31, 1986, or any portions thereof, must be received by the Regional Director during normal business hours on June 4, 1984.

This regulation specifies the submission dates for "exploratory activity" that is to be conducted during certain specified times. The dates were apparently established to insure that the results of the "exploratory activity" conducted during those periods would be available for inclusion in the report to Congress, and to facilitate the Secretary's authority to combine duplicative plans submitted at the beginning of the program. The regulation does not, however, prohibit or in any way restrict the submission of exploration plans that are meant to cover periods subsequent to the submission of the report to Congress.

The Secretary is bound by the plain language of her own regulations, just as she is bound by the plain language of subsection 1002(e)(2), and she is not free to simply interpret her regulations in a way that is in obvious conflict with what the regulations

say.[57] Thus, by the plain terms of the regulation, the State's submission was not untimely, and defendants are not barred from considering it.

**B.      Any regulation that bars consideration of the State's Plan would be invalid.**

Moreover, even if 50 C.F.R. § 37.21(b) could be read as requiring that exploration plans be submitted no later than June 4, 1984, "to be considered," it would be unlawful. Defendants lack authority to adopt regulations that violate the statute they are implementing. The Supreme Court has stated that regulations that ignore the clear intent of Congress, just like statutory interpretations that ignore that intent, must be set aside,[58] and that an agency's "rulemaking powers[s] [are] limited to adopting regulations to carry into the effect the will of Congress as expressed in the statute."[59] As demonstrated above, the plain language of subsection 1002(e)(2) does not restrict the Secretary's authority to approve exploration plans that are submitted subsequent to the submission of the report to

---

[57]      *See Fort Stewart Sch. v. Fed. Labor Relations Auth.*, 495 U.S. 641, 654 (1990) ("It is a familiar rule of administrative law that an agency must abide by its own regulations."); *Morton v. Ruiz*, 415 U.S. 199, 235 (1974) ("Where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures."). Section 1002(e) unambiguously extends the right to submit an exploration plan to "any person," and details the specific actions the Secretary is to take in response. Actions contrary to these procedures affect the rights of plan proponents to have their plans reviewed.

[58]      *See Chevron*, 467 U.S. at 843 n.9.

[59]      *Bd. of Governors v. Dimension Fin. Corp.*, 474 U.S. 361, 374 (1986).

---

Alaska's Memorandum in Support of Summary Judgment                    Page 33 of 35
*Alaska v. Jewell*, 3:14-CV-00048-SLG

Congress. Thus, any regulation that purports to bar consideration of exploration plans submitted after that date is invalid and must be set aside.

## CONCLUSION

This case presents the unusual situation of a Secretary of the Interior arguing in favor of a limitation on her own authority and preventing the gathering of scientific information. She takes the odd position that her authority to allow the State to gather information at its own expense about an important State and national oil and gas resource has expired, even though the statute that granted her that authority does not say so, the information could only be gathered in compliance with her own environmentally-protective guidelines—subject to her own ongoing oversight—and could not lead to the development of oil and gas in the coastal plain without the express authorization of Congress.

In light of the Secretary's refusal to accept what subsection 1002(e) plainly says about the extent of her authority to approve "exploration plans," one cannot help but wonder if she has allowed her own policy preferences for the use of the coastal plain to cloud her legal judgment. If the Secretary wants the law to embrace her policy vision— one where oil and gas exploration activity of any kind is prohibited from occurring in the coastal plain no matter how benign its impacts—she should seek legislation from Congress to that effect. As noted above, it is a "core administrative law principle that [she] may not rewrite clear statutory terms to suit [her] own sense of how the statute should operate." Nor may a court "alter the [plain and unambiguous] text [of a statute] to

satisfy the policy preferences" of the Secretary.[60] "The sole function of the courts is to enforce [the statute] according to its terms."[61] Accordingly, the State respectfully requests, for the reasons stated above, that the judgment prayed for be entered in its favor.


DATED September 8, 2014.

MICHAEL C. GERAGHTY<br>ATTORNEY GENERAL


By:   *s/David L. Bernhardt*
         David L. Bernhardt
         Lawrence J. Jensen
         Brownstein Hyatt Farber Schreck, LLP
         1350 I Street, NW, Suite 510
         Washington, D.C. 20005-3305
         Telephone: (202) 296-7353
         Facsimile: (202) 296-7009
         Email: dbernhardt@bhfs.com
                  ljensen@bhfs.com

         Michael S. Schechter
         Assistant Attorney General
         Alaska Bar No. 1405044
         1031 W 4th Avenue, Suite 200
         Anchorage, AK 99501
         Telephone: (907) 269-5232
         Facsimile: (907) 279-2834
         Email: mike.schechter@alaska.gov

         **Counsel for Plaintiff State of Alaska**

---

[60]   *Barnhart*, 534 U.S. at 461.

[61]   *Caminetti v. United States*, 242 U.S. 470, 485 (1917).

Case 3:14-cv-00048-SLG   Document 56   Filed 09/08/14   Page 40 of 41

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned hereby certifies that on September 8, 2014, a true and correct copy of the foregoing **PLAINTIFF STATE OF ALASKA'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT** was electronically filed with the U.S. District Court of Alaska using the CM/ECF system which will send electronic notification of such filing to the following:

Brook Brisson
Suzanne Bostrom
bbrisson@trustees.org
sbostrom@trustees.org

Peter Van Tuyn
peter@btv-law.com

Nathaniel S.W. Lawrence
nlawrence@nrdc.org

*s/ Shirley M. Newman*
Shirley M. Newman, Paralegal